UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DENNIS WADE; DENISE WADE; and
MOTORISTS MUTUAL INSURANCE CO.,
                                    Plaintiffs,
                                                                5:05-CV-1458
v.                                                              (GTS/GJD)

TIFFIN MOTORHOMES, INC.,
                                    Defendant.
_____

APPEARANCES:                                    OF COUNSEL:

COZEN O'CONNOR                                  GEORGIA S. FOERSTNER, ESQ.
   Counsel for Plaintiffs
1900 Market Street
Philadelphia, Pennsylvania 19103

ISEMAN, CUNNINGHAM, RIESTER & HYDE, LLP         BRIAN M. CULNAN, ESQ.
   Counsel for Defendant
 9 Thurlow Terrace
Albany, New York 12203

HON. GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

Currently pending before the Court in this products liability action filed by Dennis and

Denise Wade ("Plaintiffs Wade") and Motorists Insurance Company ("Plaintiff Motorists") is a

motion for summary judgment filed by Tiffin Motorhomes, Inc. ("Defendant").  (Dkt. No. 20.)

For the reasons set forth below, Defendant's motion is granted in part and denied in part; and

Plaintiffs' Complaint is dismissed except for (1) their claim for recovery of $23,436.69 for the

loss of the RV's contents under a strict liability theory of liability and/or negligence theory of

liability, and (2) their claim for recovery of $81,777.32 for the loss of the RV itself under an

implied warranty theory of liability.

I.      **BACKGROUND**

A.      **Summary of Plaintiffs' Complaint**

Liberally construed, Plaintiffs' Complaint (Dkt. No. 1) alleges as follows:

1.      In or about 2001, Plaintiffs Wade, residents of Ohio, purchased a recreational vehicle (hereinafter referred to as the "RV") that had been designed, manufactured and sold to them by Defendant in Texas;

2.      On or about November 29, 2003, while traveling from Vermont to their home in Ohio, Plaintiffs Wade spent the night in the RV at the Oneida Indian Campground in Verona, New York;

3.      While they were at the campground, a fire occurred in the RV that caused damage to both the RV and its contents;

4.      The RV was designed, manufactured, assembled, distributed and sold by Defendant in a defective manner that made it unreasonably dangerous to Plaintiffs Wade and their property;

5.      Since the RV had not been substantially altered subsequent to leaving the possession of Defendant, the dangerous condition existed at that time;

6.      The fire, and the damage caused by the fire, was the direct and proximate result of the dangerous and defective RV;

7.      At all times relevant hereto, Plaintiff Motorists had a contract with Plaintiffs Wade to insure the RV under one policy, and insure its contents under a separate policy;

8.      As a result of the damages sustained by the fire, Plaintiffs Wade made a claim under these policies;

9.      Plaintiff Motorists made payments to Plaintiffs Wade in an amount in excess of $75,000 to compensate them for their losses;

10.     Plaintiffs Wade suffered additional damages not covered by the insurance policies and seek to recover those damages from Defendant;

11.     Pursuant to its contracts with Plaintiffs Wade, Plaintiff Motorists is contractually, legally and equitably subrogated, to the extent of its payments, to Plaintiffs Wade's rights against Defendant; and

12.     Because Plaintiffs are all residents of Ohio, and Defendant is a resident of Alabama, and because the amount in controversy exceeds $75,000, complete diversity exists between the parties, pursuant to 28 U.S.C. § 1332.

**B.      Plaintiffs' Theories of Liability**

Based on these factual allegations, the Court liberally construes Plaintiffs' Complaint and its attachments as asserting the following four theories of liability against Defendants: (1) strict liability under New York State law based on Defendant's improper, defective, and unreasonably dangerous design and manufacture of the RV; (2) negligence arising from the failure of Defendant and its agents to properly design, manufacture, distribute and inspect the RV, which was the direct and proximate cause of the unreasonably dangerous condition and of the fire; (3) breach of an implied warranty of merchantability; and (4) breach of an express warranty covering, among other things, the RV's propane gas system.  (*Id.*)  As a result of the harm that Plaintiffs have suffered, Plaintiffs request a Court-issued judgment awarding the following relief: (1) judgment against Defendant in an amount in excess of $75,000.00; and (2) pre-judgment and post judgment interest, attorney's fees, the costs of this suit and such other relief as the Court may deem "just and equitable."  (*Id.*)

3

C.     **Summary Defendant's Motion for Summary Judgment**

In its motion for summary judgment, Defendant argues that Plaintiffs' claims should be dismissed for four reasons: (1) the record before the Court does not contain any admissible evidence establishing, nor does Plaintiffs' Complaint allege facts plausibly suggesting, that any personal injuries have been suffered by Plaintiffs, thus barring Plaintiffs' strict liability and negligence claims under the economic loss rule; (2) the record before the Court does not contain any admissible evidence establishing, nor does Plaintiffs' Complaint allege facts plausibly suggesting, that there is privity of contract between Plaintiff Motorists and Defendant, thus barring Plaintiff Motorists' claim for breach of implied warranties; (3) Plaintiffs Wade's express warranty had expired before the fire occurred in November of 2003, thus barring Plaintiffs' express warranty claims; and (4) should any of Plaintiffs' claims not be dismissed on the aforementioned grounds, Plaintiffs should be sanctioned with dismissal for Plaintiff Motorists' representatives' spoliation of evidence critical to the defense.  (Dkt. No. 20, at 9-17 [Def.'s Memo. of Law].)

## II.     APPLICABLE LEGAL STANDARDS

### A.     Legal Standard Governing Motions for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).

What this burden-shifting standard means when a plaintiff has failed to respond to a defendant's motion for summary judgment is that "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996). Rather, practically speaking, the Court must (1) determine what material facts, if any, are disputed in the record presented on the defendants' motion, and (2) assure itself that, based on those undisputed material facts, the law indeed warrants judgment for the defendants. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996); *Allen v. Comprehensive Analytical Group, Inc*., 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). However, the plaintiff's failure to respond to the defendant's motion for summary judgment lightens the defendant's burden on the motion.

More specifically, where a plaintiff has failed to properly respond to a defendant's factual assertions contained in its Statement of Material Facts (a/k/a its "Rule 7.1 Statement"), the factual assertions contained in that Rule 7.1 Statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding pro se, has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 243 (2d Cir. 2004); *Champion*, 76 F.3d at 486; N.D.N.Y. L.R. 7.1(a)(3); N.D.N.Y. L.R. 56.2.

Similarly, where a plaintiff has failed to respond to a defendant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the plaintiff is deemed to have "consented" to the legal arguments contained in that

memorandum of law under Local Rule 7.1(b)(3).[1]  Stated another way, where a defendant has

properly filed a memorandum of law (in support of a properly filed motion for summary

judgment), and the plaintiff has failed to respond to that memorandum of law, the only remaining

issue is whether the legal arguments advanced in the defendant's memorandum of law are

facially meritorious.[2]  A defendant's burden in making legal arguments that are facially

meritorious has appropriately been characterized as "modest."[3]

---

[1]        *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31
(N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to
oppose several arguments by defendants in their motion for summary judgment as consent by
plaintiff to the granting of summary judgment for defendants with regard to the claims that the
arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-
0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's
failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a
concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

[2]        *Hernandez v. Nash*, 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8
(N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) [citations omitted]; *accord*, *Topliff v. Wal-Mart Stores
East LP*, 04-CV-0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n.43 (N.D.N.Y. March 22, 2007)
(Lowe, M.J.); *Sledge v. Kooi*, 04-CV-1311, 2007 U.S. Dist. LEXIS 26583, at *28-29 & n.40
(N.D.N.Y. Feb. 12, 2007), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007)
(McAvoy, J.); *Kele v. Pelkey*, 03-CV-0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n.2
(N.D.N.Y. Dec. 19, 2006), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007)
(Kahn, J.).

[3]        *Ciaprazi v. Goord*, 02-CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec. 22,
2005) (Sharpe, J.; Peebles, M.J.) [citation omitted]; *accord*, *Saunders v. Ricks*, 03-CV-0598,
2006 WL 3051792, at *9 & n.60 (N.D.N.Y. Oct. 18, 2006) (Hurd, J., adopting Report-
Recommendation); *cf. Race Safe Sys. v. Indy Racing League*, 251 F. Supp.2d 1106, 1109-1110
(N.D.N.Y. 2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments,
and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under
Local Rule 7.1[b][3]); *Wilmer v. Torian*, 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2
(N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but
recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the
reasons set forth in defendants' motion papers)*, adopted by* 1997 U.S. Dist. LEXIS 16340, at *2
(N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord*, *Carter v. Superintendent Montello*, 95-CV-989,
1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.
Supp. 595 (N.D.N.Y. 1996) (Pooler, J.).

Implied in the above-stated standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[4]  In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.  *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d. Cir. 2004).  That having been said, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge."  Fed. R. Civ. P. 56(e)(1).  In addition, such an affidavit (or verified complaint) must not be conclusory.  Fed. R. Civ. P. 56(e)(2).

### B.    Legal Standard Governing Motions to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment."  *Schwartz v. Compagnise Gen. Transatlantique*, 405 F.2d 270, 273-74 (2d Cir. 1968) [citations omitted]; *accord*, *Katz v. Molic*, 128 F.R.D. 35, 37-38 (S.D.N.Y. 1989) ("This Court finds that . . . a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to

---

[4]       *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) [citations omitted]; *accord*, *Lee v. Alfonso*, No. 04-1921, 2004 U.S. App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g*, 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak*, 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell*, 289 F. Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan*, 253 F. Supp.2d 369, 371-372 (N.D.N.Y. 2003) (Hurd, J.).

7

the parties.").  Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte*, address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted.[5]  For these reasons, it is appropriate to recite the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

It has long been understood that a dismissal for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6), may be based on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim.  *Jackson v. Onondaga County*, 549 F. Supp.2d 204, 211, nn. 15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review) [citations omitted].

With regard to the first ground, Fed. R. Civ. P. 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2) [emphasis added].  By requiring this "showing," Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests."  *Jackson*, 549 F. Supp.2d at 212, n.17 [citations omitted].  The main purpose of this rule is to "facilitate a proper decision on the

---

[5]       The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis*] at any time if the court determines that . . . the action . . . is frivolous or malicious[,] . . . fails to state a claim on which relief may be granted[,] . . . or . . . seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall . . . dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted . . . ."

merits." *Id*. at 212, n.18 [citations omitted].[6]

The Supreme Court has long characterized this pleading requirement under Fed. R. Civ.

P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established

pleading requirements that exceed this liberal requirement. *Id*. at 212, n.20 [citations omitted].

However, even this liberal notice pleading standard "has its limits." *Id*. at 212, n.21 [citations

omitted]. As a result, numerous Supreme Court and Second Circuit decisions exist holding that a

pleading has failed to meet this liberal notice pleading standard. *Id*. at 213, n.22 [citations

omitted]; *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an

appellate decision holding that a complaint had stated an actionable antitrust claim under 15

U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). In doing so, the Court

"retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957),

that "a complaint should not be dismissed for failure to state a claim unless it appears beyond

doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him

to relief." *Twombly*, 127 S. Ct. at 1968-69. Rather than turning on the *conceivability* of an

actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an

actionable claim. *Id*. at 1965-74. The Court explained that, while this does not mean that a

pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the

pleading must contain at least "some factual allegation[s]." *Id*. at 1965 [citations omitted]. More

---

[6]   *See also Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* [citations omitted].[7]

As have other Circuits, the Second Circuit has recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Twombly* governs *all* claims, including claims brought by *pro se* litigants (although the plausibility of those claims is to be assessed generously, in light of the special solicitude normally afforded *pro se* litigants).[8]   It should be emphasized that Fed. R. Civ. P. 8's plausibility standard, explained in *Twombly*, was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus*, in which (when reviewing a *pro se* pleading) the Court stated, "*Specific* facts are not necessary" to successfully state a claim under Fed. R. Civ. P. 8(a)(2).  *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) [citation omitted; emphasis added].  That statement was merely an abbreviation of the often-repeated point of law–first offered in *Conley* and repeated in *Twombly*–that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim.  *Twombly*, 127 S. Ct. 1965, n.3 (citing *Conley*, 355 U.S. at 47) [emphasis added].  That

---

[7]      *See also Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) ("[The Supreme Court] is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*.").

[8]      *See, e.g., Jacobs v. Mostow*, 271 F. App'x 85, 87 (2d Cir. March 27, 2008) (in *pro se* action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'") [citation omitted] (summary order, cited in accordance with Rule 32.1[c][1] of the Local Rules of the Second Circuit); *Boykin v. KeyCorp.*, 521 F.3d 202, 215-16 (2d Cir. 2008) (finding that borrower's *pro se* complaint sufficiently presented a "*plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever.  Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level.[9]

Finally, in reviewing a complaint for dismissal under Fed. R. Civ. P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor.

## III.    UNDISPUTED MATERIAL FACTS

### A.    Facts Material to Defendant's Arguments Regarding the Economic Loss Rule, Lack of Privity of Contract, and the Expiration of the Warranty

1.    On or about February 5, 2001, Plaintiffs Wade, residents of Ohio, purchased the RV at issue in this lawsuit from Dickey-Stout Motor Ranch in Amarillo, Texas (Dkt. No. 20, Part 2, at ¶ 3; Dkt. No. 1, ¶ 6 [Plfs.' Compl.]);

---

[9]    For example, in *Erickson*, the Supreme Court held that, because the plaintiff-prisoner had alleged that, during the relevant time period, he suffered from hepatis C, he had alleged facts plausibly suggesting that he possessed a sufficiently serious medical need for purposes of an Eighth Amendment claim of inadequate medical care.  *Erickson*, 127 S. Ct. at 2199-2200.  Expressed differently, the Court held that such a plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication (a requirement that had been imposed by the district court).  This point of law is hardly a novel one, which is presumably why the *Erickson* decision was relatively brief.  Prior to the Supreme Court's decision, numerous decisions, from district courts within the Second Circuit alone, had found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment.  *See, e.g., Rose v. Alvees*, 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept. 9, 2004); *Verley v. Goord*, 02-CV-1182, 2004 WL 526740, at *10 n.11 (S.D.N.Y. Jan. 23, 2004); *Johnson v. Wright*, 234 F. Supp.2d 352, 360 (S.D.N.Y. 2002); *McKenna v. Wright*, 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord*, 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).  The important thing is that, in *Erickson*, even the *pro se* plaintiff was required to allege some sort of fact.

2.      The RV was a new 34 foot "Allegro Bay" motor home manufactured by Defendant Tiffin Motorhomes, Inc. (Dkt. No. 23, Part 1, ¶ 21; Dkt. No. 20, Part 3, ¶ 5 [Neal Aff.]);

3.      The RV was covered by a one-year/12,000 mile limited warranty extended by Defendant, which provided coverage of the structure of the RV as well as the plumbing, heating systems, electrical systems, and appliances installed by the manufacturer, under normal use (Dkt. No. 20, Part 3, ¶ 5 [Neal Aff.]; Dkt. No. 20, Part 10, at 8);

4.      The warranty covered the first purchaser of the RV, and the date of coverage began on the date of the original retail delivery (Dkt. No. 20, Part 3, ¶ 5 [Neal Aff.]; Dkt. No. 20, Part 10, at 8);

5.      Written notice of defects needed to be provided to the selling dealer or manufacturer no more than ten days after the expiration of the warranty period (Dkt. No. 20, Part 3, ¶ 5 [Neal Aff.]; Dkt. No. 20, Part 10, at 8);

6.      The limited warranty expired on the earlier of the following two dates: (1) the date on which the RV had accrued 12,000 miles; or (2) on February 5, 2002 (Dkt. No. 20, Part 3, ¶ 5 [Neal Aff.]; Dkt. No. 20, Part 10, at 8);

7.      On November 29, 2003, the RV had approximately 22,000 miles on it (Dkt. No. 20, Part 12, at 14 [Dep. Tr. Dennis Wade]; Dkt. No. 20, Part 2, at ¶ 4);

8.      Prior to November 29, 2003, Plaintiffs Wade never sought, nor did they have, any repairs made to the RV's propane gas system (Dkt. No. 20, Part 14, at 5 [Dep. Tr. Dennis Wade]);

9.      Prior to November 29, 2003, Plaintiffs Wade had not experienced any problems with the RV's propane gas system (Dkt. No. 20, Part 12, at 17 [Dep. Tr. Dennis Wade]; Dkt. No. 20, Part 13, at 4 [Dep. Tr. Dennis Wade]);

10.     Prior to November 29, 2003, Plaintiffs Wade never observed any leaks from the RV's propane gas system (Dkt. No. 20, Part 12, at 17; Dkt. No. 20, Part 2, at ¶ 6);

11.     Prior to November 29, 2003, Plaintiffs Wade never experienced a situation in which the automatic shut-off valves on the RV's propane tank had been forced into activation (Dkt. No. 20, Part 12, at 17; Dkt. No. 20, Part 2, at ¶ 7);

12.     Prior to November 29, 2003, Plaintiffs Wade never observed anything to indicate that the RV's propane gas system had been improperly secured to the RV, or that the propane gas system had become loose such that they had to have any component part of the RV's propane gas system tightened (Dkt. No. 20, Part 12, at 17; Dkt. No. 20, Part 2, at ¶¶ 5, 8, 9);

13.     In November 2003, Plaintiffs Wade took a trip from their home in Ohio, to Bedford, New Hampshire, then back to Ohio (Dkt. No. 1, at 3, ¶ 7 [Plfs.' Compl.]; Dkt. 20, Part 2, at ¶ 10);

14.     During the trip, they did not observe any significant road debris hitting the RV (Dkt. No. 20, Part 2, at ¶ 11);

15.     On November 29, 2003, Plaintiffs Wade parked the RV at the Oneida Indian Nation Campground located in Verona, NY, overnight (Dkt. No. 20, Part 13, at 5-6; *compare* Dkt. No. 23, Part 1, at ¶ 25 *with* Dkt. No. 27, at ¶ 25);

16.     On November 29, 2003, Dennis Wade believed that all plastic fittings on the RV's propane tank operated as they were intended to operate (Dkt. No. 20, Part 13, at 10; Dkt. No. 23, Part 1, at ¶ 12);

17.     On November 29, 2003, Dennis Wade believed that all safety features on the RV's propane gas system operated as they were intended to operate (Dkt. No. 20, Part 13, at 10-11);

13

18.     On November 29, 2003, a fire occurred inside the RV, destroying the RV and its contents (Dkt. No. 1, ¶¶ 7, 8 [Plfs.' Compl.]; Dkt. No. 20, Part 13, at 8-10; *compare* Dkt. No. 23, Part 1, at ¶ 22 *with* Dkt. No. 27, at ¶ 22);

19.     At the time of the fire, Plaintiffs Wade were insured against damages to the RV and its contents by Plaintiff Motorists (Dkt. No. 1, ¶ 13 [Plfs.' Compl.]; *compare* Dkt. No. 23, Part 1, at ¶ 22 *with* Dkt. No. 27, at ¶ 22);

20.     On or about November 30, 2003, Plaintiffs Wade reported the fire to Plaintiff Motorists (Dkt. No. 20, Part 13, at 14);

21.     In January and February of 2004, Plaintiffs Motorists paid to or on behalf of Plaintiffs Wade the following sums of money: $81,777.32 for the loss of the RV; $23,436.49 for the loss of its contents; and $5,911.37 for the taxes paid on the RV (Dkt. No. 20, Part 13, at 17; Dkt. No. 1, ¶ 15 [Plfs.' Compl.]);

**B.     Facts Material to Defendant's Argument of Spoliation**

22.     On or about December 3, 2003, Dan Stauffer, a fire investigator with over thirty (30) years experience investigating fires, inspected and photographed the RV at the campground, which was still allowing other campers to park there (Dkt. No. 24, Part 2 at ¶¶ 2, 3, 4 [Stauffer Aff.]);

23.     By December 3, 2003, it had been snowing for several days, including the day of the fire, and three to four inches of snow covered the ground as well as the RV and fire debris (*id*. at ¶ 5);

24.     Based upon his inspection, Mr. Stauffer made the following determinations:

      a.     The fire originated in the area of the storage compartment located directly in front of the rear wheel well on the passenger side of the RV, or compartment 3 (Dkt. No. 24, Part 2, ¶ 6 [Stauffer Aff.] );

b.      The structure of the storage compartment had been completely consumed by fire, and only the steel frame of the RV remained (*id*.);

c.      The RV's furnace, and other appliances that has either fallen during the fire or been overhauled by the fire department lay on the ground and were covered with snow (*id*.);

d.      Gas supply lines, fitting and a gas manifold were located in the rear wheel well compartment and storage compartment (*id*.);

e.      There was chaffing on one of the gas supply lines (which he marked with two nylon tags) (*id*.);

25.    The RV was subject to inclement weather, located in an unsecured area that could be accessed by anyone entering the campground, and had to be towed from the site as soon as possible (*id*. at ¶ 7);

26.    Mr. Stauffer removed and secured as evidence piping from the RV, which was made of rigid copper and attached to a fitting located in the rear wheel well, and the furnace (*id*. at ¶¶ 7, 8);

27.    On December 10, 2003, Pat Reynolds inspected the RV of behalf of Tiffin; after that inspection, the RV was shrink wrapped and towed from the campground to a storage facility. (*id*. at ¶ 10; *compare* Dkt. No. 23, Part 1, at ¶ 42 *with* Dkt. No. 27, at ¶ 42);

28.    On April 7, 2005, a second inspection of the RV occurred.  Kenneth Neal and fire investigator, Russ Auker, were present on Tiffin's behalf.  Also present were representatives of the furnace manufacturer, Suburban Furnace, which defendant had placed on notice of the fire (*compare* Dkt. No. 23, Part 1, at ¶ 43 *with* Dkt. No. 27, at ¶ 43);

29.    On June 27, 2007, Plaintiffs produced its expert reports to Defendant (*compare* Dkt. No. 23, Part 1, at ¶ 45 *with* Dkt. No. 27, at ¶ 45);

15

30.     Thereafter, Defendant requested another opportunity to inspect the RV, which request was granted (*id*.);

31.     On August 22, 2007, Plaintiff's counsel and its experts, Dennis Ware, met Tiffin's representatives in Manlius, New York, for a third inspection (*compare* Dkt. No. 23, Part 1, at ¶ 46 *with* Dkt. No. 27, at ¶ 46);

32.     During that inspection, all of the evidence was again made available to Tiffin for its inspection of the RV, its appliances and gas piping (*compare* Dkt. No. 23, Part 1, at ¶ 47 *with* Dkt. No. 27, at ¶ 47); and

33.     Defendant was provided with the section of piping that was removed, which was re-attached to the fitting in the rear wheel well and marked by Defendant's expert (Mr. Higgins) with a paint stick (*id*.)

## IV.    ANALYSIS

### A.    Whether the Economic Loss Doctrine Bars Plaintiffs' Causes of Action for Strict Liability and Negligence

As stated above in Part I.A. of this Decision and Order, the first and second causes of action contained in Plaintiffs' Complaint assert claims sounding in strict liability and negligence. As stated above in Part I.B. of this Decision and Order, Defendants argue that these two causes of action are barred by the economic loss rule, because the record before the Court does not contain any admissible evidence establishing (nor does Plaintiffs' Complaint allege facts plausibly suggesting) that Plaintiffs Wade suffered any personal injuries arising from the fire in question.

In response, Plaintiffs argue that the economic loss doctrine does not apply under the circumstances for two reasons: (1) their losses occurred from "an abrupt cataclysmic occurrence"; and (2) they seek to recover losses to "other property."  (Dkt. No. 22, Part 1, at 7.)

16

Generally, under the economic loss doctrine, while a product owner may have tort remedies against a product manufacturer for personal injuries caused by a defect in the product, an owner of a product who suffers purely monetary harm to the product itself, due to a defect in the manufacturing or installation of the product, is limited to only whatever remedy the owner may have in contract (i.e., he may not recover in tort under a negligence or strict liability theory of liability). *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 869-70 (1986). One of the rationales for this rule is that allowing tort recovery for purely monetary harm in the absence of privity of contract would "eliminate the distinction between warranty and strict products liability." *East River Steamship Corp.*, 476 U.S. at 867 [citation omitted].

The economic loss doctrine has been adopted by most states, including the three states whose law might apply in this case under a choice-of-law analysis: New York (the site of the fire); Texas (the home of Defendant, and the site of Plaintiffs' purchase of the RV); and Ohio (the home of Plaintiffs). *See*, *e.g.*, *Bocre Leasing Corp. v. Gen. Motors Corp.*, 84 N.Y.2d 685 (N.Y. 1995); *Pugh v. Gen. Terrazzo Supplies, Inc.*, No. 01-06-0449, 2007 Tex. App. LEXIS 5454 (Tex. Ct. App., July 12, 2007); *Columbia Gas of Ohio, Inc. v. Crestline Paving & Excavating Co., Inc.*, 2003 Ohio 793 (Oh. 2003).[10]

At its core, Plaintiffs' first reason as to why the economic loss doctrine does not apply is based on the manner in which the product is injured. As an initial matter, it appears that the Supreme Court has expressly rejected this rationale for finding the economic loss doctrine inapplicable:

---

[10]      In particular, it is worthy of note that courts in at least two of these three states have applied the economic loss doctrine in cases involving defects in motor homes. *See*, *e.g.*, *Progressive Ins. Co. v. Monaco Coach Corp.*, 819 N.Y.S.2d 212, at *2 (N.Y. Sup. Ct., Nassau County, 2006) (dismissing all products liability and negligence claims asserted by insurer against manufacturer and retailer of motor home whose alleged defect caused fire inside motor home); *Nobility Homes of Tex., Inc., v. Shivers*, 557 S.W.2d 77, 77-83 (Tex. 1977) (affirming award to owners of mobile home for economic loss arising from various workmanship defects in mobile home, under breach of implied warranty theory of liability).

> Nor do we find persuasive a distinction that rests on the manner in which the product is injured.  We realize that the damage may be qualitative, occurring through gradual deterioration or internal breakage.  Or it may be calamitous. . . .  But either way, since by definition no person or other property is damaged, the resulting loss is purely economic.  Even when the harm to the product itself occurs through an abrupt, accident-like event, [if no person or other property is damaged], the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain-traditionally the core concern of contract law.

*East River Steamship Corp.*, 476 U.S. at 870 [citation omitted; emphasis added]; *see also Trans Hudson Express, Inc. v. Nova Bus Co.*, 06-CV-4092, 2007 WL 1101444, at *5 (D.N.J. Apr. 11, 2007) (noting that, in light of the Supreme Court's East River decision, "it is reasonable to assume that the New Jersey Supreme Court would . . . reject[] the 'sudden and calamitous' exception to the economic loss doctrine.").  The Court acknowledges that there is language in some New York State Appellate Division cases indicating that the abruptness of an event may be a relevant factor in determining whether the economic loss doctrine applies.  (*See* Dkt. No. 22, Part 1, at 8-9.)  However, the Court finds the Supreme Court's analysis of the subject in *East River Steamship Corp.* to be better reasoned.  As a result, the Court is not persuaded by Plaintiffs' reliance on the abrupt nature of the fire in arguing that the economic loss rule does not apply.

Having said that, Plaintiffs in this action do not seek to recover for a loss due merely to "repair costs" and the "decreased value of the RV" mentioned by the Supreme Court in *East River Steamship Corp.*; rather, they seek to recover also for the loss of "other property" that was inside the RV.  At its core, this approach hinges on a distinction between a monetary loss caused by an injury to a product and a monetary loss caused by an injury to the product's contents.

Although legal disputes surrounding the economic loss rule, and its relevant scope, are numerous in nature, the Supreme Court has provided courts with guidance regarding whether or not a party who suffers a monetary loss caused by an injury to the product's contents may

recover, in tort, for the loss of "other property."  In *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875 (1997), the Supreme Court was faced with the issue of whether "equipment added to a product after the Manufacturer (or distributor selling in the initial distribution chain) has sold the product to an Initial User is . . . part of the product that itself caused physical harm," or whether the added equipment constitutes "other property."  520 U.S. at 877.  The Court ultimately concluded that the added equipment is "other property" and, in doing so, held that such equipment, which was destroyed by the product, enjoys protections under tort law.  *Id.* at 882-85.[11]

Since the Supreme Court decided *Saratoga Fishing Co.*, decisions by other courts (including courts applying New York law) have made clear that, when a product causes damage not only to itself, but to "other property," tort liability is "generally present."  *See, e.g., Bocre Leasing Corp. v. Gen. Motors Corp.*, 84 N.Y.2d 685, 692 (N.Y. 1995) (stating that tort liability is "generally present" when "personal injury and *other property damage*" is at issue) [emphasis added]; *Praxair, Inc. v. Gen. Insulation Co.*, 611 F. Supp.2d 318, 326 (W.D.N.Y. 2009) ("Critical to a determination of whether a tort claim is barred by the economic loss doctrine is whether damages are sought for the failure of the product to perform its intended purpose, in which case recovery is barred by the economic loss doctrine, or for direct and consequential damages caused by a defective and unsafe product.  The economic loss doctrine does not apply where a defective product causes damage to 'other property.'"); *Travelers Cas. and Sur. Co. v. Dormitory Authority–State of N.Y.*, 07-CV-6915, 2008 WL 1882714, at *3 (S.D.N.Y. Apr. 25, 2008) ("Courts have recognized an exception to the economic loss doctrine where a defective product causes damage not only to itself, but also to other property."); *Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp.2d 241, 272 (S.D.N.Y. 2001) ("The economic loss doctrine as

---

[11]     The Court also concluded that the economic loss rule barred recovery for the ship itself.  *Saratoga Fishing Co.*, 520 U.S. at 884.

articulated in *East River Steamship* only barred tort recovery for damage to the allegedly

defective product itself.  It does not preclude recovery in tort for damage caused by the defective

product to 'other property.'"); *Arkwright Mut. Ins. Co. v. Bojoirve, Inc.*, 93-CV-3068, 1996 WL

361535, at *3 (S.D.N.Y. June 27, 1996).

Here, similar to some of the cases cited by the Supreme Court in *Saratoga Fishing Co.*,[12]

the property inside of the motor home is property separate and apart from the motor home.

Accordingly, such "other property" is subject to recovery in tort under a strict liability theory of

liability and/or negligence theory of liability.[13]  However, based on the Supreme Court's

conclusions in *East River Steamship Corp.* and *Saratoga Fishing Co.* that the economic loss rule

bars the recovery for monetary harm caused by the loss of the harm-causing product itself, the

Court agrees with Defendant that the most that is at issue under Plaintiffs' tort theories of

liability is the $23,436.69 for the "other property," payable only to Plaintiff Motorists.  The

$81,777.32 is clearly not recoverable from Plaintiff Motorists' tort theories of liability because

---

[12]     *See Saratoga Fishing Co.*, 520 U.S. at 880-81 (citing, *inter alia*, *A.J. Decoster Co. v. Westinghouse Elec. Corp.*, 634 A.2d 1330 [Md. 1994] [owner of a chicken farm recovered damages in tort for chickens killed when the chicken house ventilation system failed, suffocating the 140,000 chickens inside]; *United Air Lines, Inc. v. CEI Industries of Ill., Inc.*, 499 N.E.2d 558 [Ill. 1986] [warehouse owner recovered in tort for damage to a building caused by a defective roof]).

[13]     *See also 2-J Corp. v. Tice*, 126 F.3d 539, 544 (3d Cir. 1997) (holding that a purchaser of a warehouse may recover in tort from the manufacturer of the warehouse for damages caused to the contents of the warehouse after the warehouse collapsed); *McAteer v. Black & Decker, Inc.*, 98-CV-303, 1999 WL 33836701, at *2 (M.D. Fla. Sept. 13, 1999) (denying motion to dismiss claims under the theory that the alleged damage was the result of a breach of contractual duty because personal belongings contained within a motor home, which were destroyed as a result of the motor home catching fire, constitute other property); *Nicor Supply Ships Assocs. v. Gen. Motors Corp.*, 876 F.2d 501 [5th Cir. 1989] [Seismic equipment placed on board vessel by time charterer and damaged in fire allegedly caused by defective engine was "other property" not covered by contract under which vessel was sold, as opposed to the allegedly defective product, which was the vessel and defective engine, and thus, damage to seismic equipment was injury for which time charterer could recover in tort]).

that amount flows from the loss of the RV itself.[14]  Furthermore, no amount at all could be

recoverable by Plaintiffs Wade under Plaintiffs' tort theories of liability, because such an amount

would constitute an impermissible windfall.

As a result, the Court dismisses Plaintiffs' claim for recovery of $81,777.32 for

the loss of the RV itself under a strict liability theory of liability and/or negligence theory of

liability, because of the economic loss doctrine.  However, surviving this argument by Defendant

(at least until consideration of Defendant's spoliation argument below in Part IV.C. of this

Decision and Order) is Plaintiffs' claim for recovery of $23,436.69 for the loss of the RV's

contents under a strict liability theory of liability and/or negligence theory of liability.

**B.      Plaintiffs' Breach-of-Warranty Claim**

As stated above in Part I.A. of this Decision and Order, the third cause of action

contained in Plaintiffs' Complaint asserts two claims on behalf of Plaintiffs Wade and Motorists:

(1) a claim for breach of an implied warranty of merchantability; and (2) a claim for breach of an

express warranty covering, among other things, the RV's propane gas system.

---

[14]      *See, e.g.*, *Progressive Ins. Co. v. Sacramento County Coach Showcase*, 07-CV-1087, 2008 WL 5377993, at *7 (D. Nev. Dec. 23, 2008) ("[T]he economic loss doctrine bars both negligence and strict liability recovery for the damage the battery equalizer caused to the RV itself.  However, [Plaintiffs] also allege[] damages to 'personal property.'  Although [Plaintiffs are] not clear as to what constitutes the personal property, view[ed] . . . in the light most favorable to Plaintiffs, the alleged personal property is property other than the defective entity, the RV, itself.  Thus, the economic loss doctrine does not bar Plaintiffs' negligence and strict liability claims to the extent that Plaintiffs allege damage to property not an integral part of the RV itself."); *Indemnity Ins. Co. of North Am. v. Am. Eurocopter LLC*, 03-CV-949, 2005 WL 1610653, at *15 (M.D. N.C. July 8, 2005) ("[T]he Court finds that the helicopter was the 'product' that was the subject of the parties' bargain, and any negligence claims against E.S.A.S. for negligent design or manufacture of the helicopter itself would be barred by the economic loss rule to the extent Plaintiff now seeks recovery for the helicopter itself from E.S.A.S.  However, any equipment added by Duke to the helicopter after the sale [such as medical equipment] would be 'other property' [as recognized by the U.S. Supreme Court's decision in East River], and any damage to property on the ground where the helicopter crashed would be 'other property.'").

      **1.**      **Whether the Lack of Privity Between Plaintiff Motorists and Defendant Bars Plaintiff Motorists' Claim for Breach of Implied Warranty of Merchantability**

As stated above in Part I.B. of this Decision and Order, Defendant argues that the record before the Court does not contain any admissible evidence establishing, nor does Plaintiff's Complaint allege facts plausibly suggesting, that there is privity of contract between Plaintiff Motorists and Defendant, thus barring Plaintiff Motorists' claims for breach of implied warranty of merchantability.  In response, Plaintiffs argue that, because Plaintiffs Wade have "contractual privity" with Defendant, and because Plaintiff Motorists "stands in the shoes" of Plaintiffs Wade as their subrogee, Plaintiff Motorists also has "contractual privity" with Defendant, thus enabling Plaintiff Motorists to assert an implied warranty claim.  (Dkt. No. 22, Part 1, at 18-19.)

"Subrogation is the right one party has against a third party following payment, in whole or in part, of a legal obligation that ought to have been met by the third party." *Allstate Ins. Co. v. Mazzola*, 175 F.3d 255, 258 (2nd Cir. 1999) (quoting 2 Allan D. Windt, *Insurance Claims and Disputes* § 10.05 [1995]).  "The doctrine of equitable subrogation allows insurers to 'stand in the shoes' of their insured to seek indemnification by pursuing any claims that the insured may have had against third parties legally responsible for the loss." *Mazzola*, 175 F.3d at 258.  As a result, whatever claims the Wades may assert against Defendant, Plaintiff Motorists may assert against Defendant.

With regard to Plaintiffs' breach of implied warranty claim, "New York's Commercial Code § 2-314 . . . states that 'a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind . . . .'" *Castro v. QVC Network, Inc*., 139 F.3d 114, 118 n.7 (2d Cir. 1998).  "'Goods to be merchantable must be . . . fit for the ordinary purposes for which such goods are used . . . .'" *Castro*, 139 F.3d at

118 n.7 (citing N.Y. U.C.C. § 2-314 [McKinney 1993]).  "Section 318 . . . provides that '[a]

seller's warranty whether express or implied extends to any natural person if it is reasonable to

expect that such person may use, consume or be affected by the goods and who is injured in

person by breach of the warranty.'"  *Id.* (citing N.Y. U.C.C. § 2-318).  Therefore, a purchaser

may assert a breach of implied warranty claim against a seller if the purchased product is not "fit

for the ordinary purposes for which such goods are used."  *Id*.

   However, with regard to asserting a claim against a manufacturer, the general rule is that,

"absent privity of contract, a purchaser cannot recover mere economic loss against a

manufacturer under a theory of breach of implied warranty."  *Westchester County v. Gen. Motors*

*Corp.*, 555 F. Supp. 290, 294 (S.D.N.Y. 1983); *see also Rosen v. Hyundai Group*, 829 F. Supp.

41, 49-50 (E.D.N.Y. 1993) (only "sellers" are liable for breach of warranty under N.Y. U.C.C.);

*Arthur Glick Leasing, Inc. v. William J. Petzold, Inc.*, 51 A.D.3d 1114, 1117 (N.Y. App. Div.,

3rd Dept. 2008) (manufacturer of defective yacht engine was not in privity with purchaser of

yacht itself and therefore not liable for defects under breach of implied warranty theory).

"However, New York recognizes an exception to this principle where the product in question is a

'thing of danger.'"  *Hubbard v. Gen. Motors Corp.*, 95-CV-4362, 1996 WL 274018, at *5

(S.D.N.Y. May 22, 1996); *Goldberg v. Kollsman Instr. Corp.*, 12 N.Y.2d 432, 436 (N.Y. 1963).

More specifically, "where an article is of such a character that when used for the purpose for

which it is made it is likely to be a source of danger to several or many people if not properly

designed and fashioned, the manufacturer as well as the vendor is liable, for breach of

law-implied warranties, to the persons whose use is contemplated."  *Hubbard*, 1996 WL 274018,

at *5 (quoting *Goldberg*, 12 N.Y.2d at 436) (other citation omitted).[15]

"The purchaser of an automobile is certainly a person whose use of the product is contemplated by the manufacturer." *Id.* (holding that "a vehicle equipped with a defective braking system is likely to be a source of danger when driven.").  Moreover, unlike the defects in *Petzold* (a yacht engine), *Westchester* (an air conditioner), and *Mendelson* (a car transmission), a defective propane gas system attached to a recreational vehicle (which is intended to house sleeping individuals alongside gas appliances such as a gas furnace, gas water heater, gas range, gas grill and gas refrigerator) is much more likely to be a "thing of danger" for the foreseeable users of the product.  (*See* Dkt. No. 20, Part 11, at 12-15 [attached pages "38" through "45" of the Allegro Bay Owner's Manual, describing gas appliances, and safety concerns due to gas]; Dkt. No. 20, Part 12, at 12, 15 [attaching pages "15" and "27" of Wade Depo. Trans.].) Therefore, although Defendant is correct in noting the lack of privity between itself and Plaintiff, that lack of privity is irrelevant under the circumstances.

For these reasons, and because the Court finds that there is a question of fact as to whether or not the propane gas system in Plaintiff's RV was actually defective, the Court denies

---

[15]      In *Hubbard*, the court attempted to clarify the inconsistency between cases involving transportation vehicles that have dismissed a purchasers claims based on lack of privity and cases that have allowed the purchasers claims under the "thing of danger" exception. More specifically, the court pointed out that, "[i]n *Mendelson,* . . . the plaintiffs alleged that the defendant substituted an inferior transmission for the one that should have been installed in its 1979 Oldsmobiles.  The plaintiff in *Westchester County* . . . claimed that the defendant had manufactured defective air conditioners, which were installed in the buses it purchased; and the claim in *Rosen* . . . was for defective pianos.  The Court finds that plaintiff's claim alleging a defective braking system is *qualitatively different from claims against an automobile manufacturer alleging the use of inferior transmissions or the design of defective air conditioners, in that a vehicle with defective brakes is a thing of danger*."  *Hubbard*, 1996 WL 274018, at *5 n.7 [emphasis added].

24

Defendants' motion for summary judgment with regard to Plaintiffs' implied warranty claim.

Accordingly, Plaintiffs' claim for recovery of $81,777.32 for the loss of the RV itself under an

implied warranty theory of liability survives summary judgment.

> **2.      Whether the Expiration of the Limited Warranty Before the Fire
>             Bars Plaintiffs' Claim for Breach of Express Warranty Covering,
>             Among Other Things, the RV's Propane Gas System**

As stated above in Part I.B. of this Decision and Order, Defendant argues that the

warranty had expired before the fire occurred in November of 2003, thus barring Plaintiffs' claim

for breach an express warranty covering, among other things, the RV's propane gas system.

Plaintiffs fails to directly respond to this legal argument in their memorandum of law.  (*See* Dkt.

No. 22, Part 1, at 18-19 [Plfs.' Opp. Memo. of Law].)  Granted, Plaintiffs offers a brief legal

argument regarding Plaintiffs' implied warranty claim.  (*Id*.)  However, that legal argument does

not address Defendant's attack on Plaintiffs' *express* warranty claim.  (*Id*.)[16]

Where a non-movant has failed to respond to a legal argument contained in memorandum

of law submitted in support of a movant's properly filed motion for summary judgment, the non-

movant is deemed to have "consented" to that legal argument under Local Rule 7.1(b)(3) of the

Local Rules of Practice for this Court–so long as the legal argument is facially meritorious.  *See*

*Cusamano v. Sobek*, 604 F. Supp.2d 416, 453-54 & nn.50-51 (N.D.N.Y. 2009) (Report-

Recommendation of Lowe, M.J., adopted by Suddaby, J.) [collecting cases].  A defendant's

burden in making legal arguments that are facially meritorious has appropriately been

---

[16]      The closest Plaintiffs come to doing so is when they make a passing reference to
the Wades' "contractual privity" with Defendant.  (Dkt. No. 22, Part 1, at 19.)  However, the
point of that reference is to support Plaintiffs' argument that, because Plaintiff Motorists "stands
in the shoes" of Plaintiffs Wade, Plaintiff Motorists also has "contractual privity" with
Defendant, thus enabling Plaintiff Motorists to assert an implied warranty claim.  (*Id*. at 18-19.)
The argument has nothing to do with the Wades' lack of express warranty claim due to the
expiration of the express warranty.

characterized as "modest."  *Cusamano*, 604 F. Supp.2d at 454 at n.52 [collecting cases]

Here, the Court finds that Defendant's legal argument is, at the very least, facially

meritorious.  Indeed, the Court finds that Defendant's legal argument would survive even the

close scrutiny appropriate for a contested motion for summary judgment.

 As explained above in Part III of this Decision and Order, the RV at issue in this action

was subject to an express limited warranty, allowing coverage for one year or 12,000 miles.

When the RV was purchased in February of 2001, the coverage provided that the RV, including

the structure, plumbing, heating and electrical systems, and appliances installed by the

manufacturer would be free from defect in either the material or workmanship.  The warranty

covered the first purchaser of the RV, and the date of coverage began on the date of the original

retail delivery.  Written notice of defects needed to be provided to the selling dealer or

manufacturer no more than ten days after the expiration of the warranty period.

The fire giving rise to this action occurred on November 29, 2003, at which time the RV

had accrued approximately 22,000 miles.  The limited warranty would have expired on one of

the following two dates: (1) the date on which the RV had accrued 12,000 miles; or (2) on

February 5, 2002.

As a result, the Court dismisses Plaintiffs' claim for breach of express warranty covering,

among other things, the RV's propane gas system.

### C.    Defendant's Alternative Ground for Dismissal: Spoliation of Evidence

In the alternative, Defendant argues that Plaintiffs should be sanctioned because of

Plaintiff Motorists' representatives' spoliation of evidence critical to Defendant's defense in

December of 2003.  (Dkt. No. 20, Part 5.)  More specifically, Defendant argues that, because

Plaintiff Motorists' representative disassembled the propane gas lines prior to determining that

set up of the lines caused the RV to catch fire, Defendant's "ability to get a precise picture of

26

where the lines were running in the vehicle at the time of the fire has proven to be virtually impossible." (*Id*. at 21-22.)  Defendant adds that "[t]his is extremely problematic because the description of the location of the propane lines at the time of the fire are not consistent with the [Recreational Vehicle Industry Association or "RIVA"]-approved schematics for the propane lines in an Allegro Bay motor home." (*Id*.)  As a remedy, Defendant requests either the dismissal of Plaintiff's action or the exclusion of any expert testimony on Plaintiff's behalf at any trial of this action.  (*Id*. at 22.)

In response, Plaintiffs argue that sanctions are inappropriate because (1) Motorists' representative acted reasonably under the circumstances, (2) Defendant had multiple opportunities to test and inspect the RV, (3) Defendant's claim that it has been prejudiced by Plaintiff's failure to mark the fittings with a paint stick is disingenuous in that Defendant participated in the destructive examination of this evidence in April 2005, and (4) any criticism of, or shortcomings in, how Plaintiff's experts secured the evidence may be addressed by defendant on cross-examination.  (Dkt. No. 22, Part 1, at 14-20.)

"Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc*., 473 F.3d 450, 457 (2d Cir. 2007) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 [2d Cir. 1999]); *accord, Byrnie v. Town of Cromwell*, 243 F.3d 93, 107 (2d Cir. 2001).  Here, Plaintiffs acknowledge that–after the fire but before giving Defendant an opportunity to examine the gas line in its post-accident condition–Plaintiff Motorists' fire investigator, Mr. Stauffer, photographed and removed the propane gas line attached to the RV.  Based on this admission, the Court finds a spoliation analysis appropriate.

Before a court may sanction a party for spoliation of evidence, the moving party must show that (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed, (2) the party having control over the evidence acted with a culpable state of mind, and (3) the missing evidence is relevant to the moving party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) [citation omitted]; *cf. Houlihan v. Marriott Int'l, Inc.*, 00-CV-7439, 2003 WL 22271206, at *2 (S.D.N.Y. Sept. 30, 2003) ("Once a duty to preserve evidence has been established, a court must then assess: (1) the relative fault of the litigant against whom sanctions are sought; (2) the degree of prejudice suffered by the movant due to the destruction or loss of the evidence at issue; and (3) the appropriate sanction.") [citations omitted].

### 1.    Duty to Preserve Evidence

"The obligation to preserve evidence of this nature occurs when a party has notice or knowledge or should have known that the evidence may be relevant in future litigation." *Allstate Ins. Co. ex rel. Lothridge v. Gonyo*, 07-CV-1011, 2009 WL 962698, at *8 (N.D.N.Y. Apr. 8, 2009) (Treece, M.J.) (citing *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 [2d Cir. 2001]); *accord, Kronisch v. United States*, 150 F.3d 112, 126-127 (2d Cir. 1998).

Here, the Court finds that Plaintiff had a duty to preserve all evidence regarding the RV for the following five reasons: (1) Plaintiffs do not deny that they were under a duty to preserve the evidence; (2) Plaintiff Motorists had knowledge or should have known that the evidence may be relevant in future litigation;[17] (3) the magnitude of the losses was significant; (4) Plaintiff

---

[17]    The Second Circuit has made clear that the obligation to preserve may not continue indefinitely, and, where the defendant fails to ask to inspect the evidence at issue, the defendant may not later seek sanctions for spoliation from the court. *Hamilton Beach Proctor*

Motorists attempted to document the damage through photographs and reports; and (5) the

person hired by Plaintiff Motorists to document the damage was an "expert" fire investigator.

*See Indemnity Ins. Co. of North America v. Liebert Corp.*, 96-CV-6675, 1998 WL 363834, at *4

n.3 (S.D.N.Y. June 29, 1998) (finding that "the following factors demonstrate that plaintiff was

on notice that a lawsuit was likely so as to trigger a duty to preserve the evidence: (1) the sheer

magnitude of the losses; (2) that plaintiff attempted to document the damage through

photographs and reports; and (3) that it immediately brought in counsel as well as experts to

assess the damage and attempt to ascertain its likely causes in anticipation of litigation").

### 2.    Culpable State of Mind

Plaintiffs argue that, "[h]ad Mr. Stauffer not removed the gas piping when he did, it could

have been further damaged tampered with or lost altogether [given that] [t]he RV was located in

an unsecured area that could have been accessed by anyone entering the campground, and was

exposed to inclement weather."  (Dkt. No. 22, Part 1, at 15-16.)  Plaintiffs further argue that, "at

the time Mr. Stauffer removed the piping, he did not know if or when any other experts would be

inspecting the RV."  (*Id*.)  "All he knew was that the RV had to be towed from the campground

as soon as possible[, and] . . . that the piping was at risk of being damaged or lost during transit."

(*Id*.)

Before 2002, "[t]he law in this circuit [was] not clear on what state of mind" was

sufficiently culpable.  *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107-108 (2d Cir. 2001).  At

various times, the Second Circuit had required showings that the party intentionally destroyed

evidence, that the party had acted in bad faith, and that the party acted with gross negligence.

---

*Silex, Inc*., 473 F.3d at 458.  For purposes of deciding this motion, the Court will assume that
Defendant did not delay in inspecting the RV.

*Byrnie*, 243 F.3d at 107-108.  Acknowledging that its precedents were inconsistent, the Second

Circuit concluded that a case-by-case approach was appropriate.  *Id*.  In 2002, the Second Circuit

held that even simple negligence was a sufficiently culpable "state of mind."  *Residential*

*Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 108 (2d Cir. 2002)

Here, granted, the RV was exposed to inclement weather, as evidenced by the amount of

snow that can be seen in a number the photographs taken by Mr. Stauffer on December 3, 2005.

(*See generally* Dkt. No. 24, Parts 3-9 [attaching photographs taken on Dec. 3. 2005]; Dkt. No.

25, Part 2 [attaching photographs taken on Dec. 3. 2005]; Dkt. No. 25, Part 3, at 1-3 [attaching

photographs taken on Dec. 3. 2005])  Moreover, several photographs were taken of the piping

and furnace *before* the removal of those items on December 3, 2005.  (Dkt. No. 24, Part 2 at ¶¶

3, 7 [Stauffer Aff.]; *see*, *e.g.*, Dkt. No. 24, Part 4, at 8 [attaching Photograph 16]; Dkt. No. 24,

Part 5, at 1 [attaching Photographs 17 and 18]; Dkt. No. 24, Part 6, at 2-5 [attaching Photographs

33 through 39]; Dkt. No. 24, Part 9, at 2-3 [attaching Photographs 77 through 80].)

However, the record evidence reveals that Defendant had an expert examine the RV at

the campground where Mr. Stauffer examined it, seven days after Mr. Stauffer's examination.

This fact somewhat undermines (1) Plaintiffs' argument that the piping and furnace needed to be

removed for security reasons, and (2) Plaintiffs' implicit argument that Mr. Stauffer needed to

act quickly because the RV had to be towed from the campground as soon as possible.  In

addition, the record evidence reveals that, after that inspection, the RV was shrink-wrapped and

towed from the campground to a storage facility.  This fact suggests that the RV was capable of

being transported prior to its piping being dismantled.  Finally, as a fire investigator for thirty

years, the Court finds that Mr. Stauffer knew or should have known that other experts would be

inspecting the RV, and that litigation was likely.

For all of these reasons, the Court concludes that, "while the actions of plaintiff do not rise to the level of bad faith, they certainly amount to negligence." *Indemnity Ins. Co. of North America v. Liebert Corp.*, 96-CV-6675, 1998 WL 363834, at *4 n.3 (S.D.N.Y. June 29, 1998) (noting that "Plaintiff made diligent efforts to document the damage in support of its anticipated lawsuit, but failed to take reasonable precautions to preserve the integrity of the actual equipment itself") [citation omitted].

### 3.    Relevance of Evidence

"When a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from a which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party." *Residential Funding*, 306 F.3d at 109. "By contrast, when the destruction is negligent, relevance must be proven by the party seeking the sanctions." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003). As the Second Circuit has explained,

> [The word] relevant . . . means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence. Rather, the party seeking [sanctions] must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed . . . evidence would have been of the nature alleged by the party affected by its destruction.

*Residential Funding*, 306 F.3d at 108-09.

Here, the Court finds that Defendant has adduced sufficient evidence from which a reasonable trier of fact could infer that the location (and condition) of the gas lines, prior to removal, would have been favorable to Defendant and unfavorable to Plaintiff. For example, Defendant has adduced engineering diagrams showing the routing of the propane lines as designed at the factory to be inconsistent with the routing reportedly observed by Mr. Stauffer

before he removed the gas lines.  (Dkt. No. 20, Part 3, at ¶¶ 15, 16; Dkt. No. 20, Part 10, at 3-4.)

Moreover, record evidence exists that, despite having personally examined the underpart of the

entire vehicle front to rear once per trip, Mr. Wade (who worked with propane as part of his

business) never observed anything that would indicate that the propane gas piping system was

improperly secured on the vehicle.  (Dkt. No. 20, Part 12, at 17 [attaching page "37" of Wade

Depo. Trans.]; Dkt. No. 20, Part 13, at 3, 10, 11 [attaching pages "38," "69," and "70" of Wade

Depo. Trans.].)

### 4.      Appropriate Sanction

Although a district court has "wide latitude in determining an appropriate sanction for

spoliation," the Second Circuit has made clear "that the applicable sanction should be molded to

serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine."  *Id.*

(internal quotation marks and citations omitted).  Stated another way,

> [T]he sanction should be designed to: (1) deter parties from engaging
> in spoliation; (2) place the risk of an erroneous judgment on the party
> who wrongfully created the risk; and (3) restore 'the prejudiced party
> to the same position he would have been in absent the wrongful
> destruction of evidence by the opposing party.'

*West*, 167 F.3d at 779 (citing *Kronisch v. United States*, 150 F.3d 112, 126 [2d Cir. 1998]).

"Sanctions can range from dismissal of the complaint to rendering an adverse inference

instruction to the jury."  *Gonyo*, 2009 WL 962698, at *8.  "Dismissal of the complaint would be

appropriate if the spoliation was done with wilfulness, bad faith, or fault on the part of the

sanctioned party."  *Id.* (internal quotation marks and citations omitted).  However, "dismissal is

not limited only to matters where the offending party has acted with bad faith or willful intent,

but is permitted where there is any fault of the sanctioned party."  *Beers v. Gen. Motors Corp.*,

97-CV-0482, 1999 WL 325378, at *4 (N.D.N.Y. May 17, 1999) (McCurn, J.) (citing *Bobal v.*

*Rensselaer Polytechnic Institute*, 916 F.2d 759, 764 [2d Cir. 1990]).  This is because other

factors–such as the degree of prejudice to the moving party–may be considered by the court.  *See*

*Beers*, 1999 WL 325378, at \*5 (considering the ability of the sanction to cure the prejudice to the

moving party).[18]

      Here, because of the relevance of the evidence in question, the negligence of Mr. Stauffer

caused Defendant to suffer a certain degree of prejudice.  This is because Defendant did not have

an opportunity to have one of its experts examine the propane gas lines before their removal.

However, the Court finds that the degree of prejudice suffered by Defendant was somewhat

limited by three facts.

      First, Defendant's experts had an opportunity to examine numerous photographs of the

RV that were taken after the accident but before the gas lines were removed.  *See*, *supra*, Part

IV.C.1. of this Decision and Order (collecting record cites of such photographs).  Second,

Defendant's experts had an opportunity to examine the RV and its gas lines after the gas lines

were removed, and, by using the aforementioned photographs and reassembling the gas lines,

---

[18]    *See also Brancaccio v. Mitsubishi Motors Co., Inc*., 90-CV-7852, 1992 WL
189937, at \*2 (S.D.N.Y. July 7, 1992) (plaintiff's negligent loss of the defective product, after
her expert had examined it, but where defendant had not, necessitated dismissal under Rule 37);
*but see Thiele v. Oddy's Auto and Marine Inc*., 906 F. Supp. 158, 162-63 (W.D.N.Y.1995)
(denying defendant's request to dismiss under theory of spoliation where defendant had an
opportunity to inspect the evidence at the same time it was inspected by plaintiffs and granting
third-party defendant's request to dismiss under theory of spoliation where third-party defendant
"was never offered any opportunity to inspect the boat . . . [and] was not even notified of the
accident until the boat had been destroyed."); *Liebert Corp*., 1998 WL 363834, at \*6 (holding
that dismissal is not the appropriate sanction, despite plaintiff's expert losing evidence, because
parties other than the plaintiff had an opportunity to examine the evidence before it was lost, the
evidence was not willfully discarded, photographs of the evidence were available, and the
plaintiff would have no other available remedy); *Gregg v. R.D. Werner Co. Inc*., 94-CV-9258,
1997 WL 316476, at \*2 (S.D.N.Y. June 11, 1997) (denying defendant's motion to dismiss based
on spoliation because the "allegedly defective product [a ladder] was inadvertently left behind at
the scene of the accident under emergency circumstances and prior to the contemplation of
litigation.").

could have determined (1) whether or not the location of the gas lines was at least consistent with the RIVA-approved schematics, and (2) whether the removal of the gas lines caused any alterations in the gas lines.  (The Court notes that Defendant's experts reassembled the propane gas line piping in the RV on two separate occasions.)  Third, Defendant's experts were given an opportunity to review Plaintiffs' experts' reports prior to conducting their final inspection of the evidence.  This provided Defendant with an opportunity to discover any discrepancies between their findings and Plaintiffs' experts' findings brought out as a result of Mr. Stauffer removing the gas line piping and furnace.  The Court notes there is no evidence *from any of Defendant's four experts* to suggest that any one of them was prevented from reaching any conclusions or formulating any opinions based on Mr. Stauffer's removal of the gas line piping.[19]

The Court has carefully balanced this limited prejudice against the fact that the loss incurred by Plaintiffs in this case is substantial, dismissal would leave it without a remedy, and dismissal is a drastic remedy, which should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions.  *Gonyo*, 2009 WL 962698, at *8 (internal quotation marks and citation omitted).  Under the circumstances, the Court finds that dismissal in this case is too severe a sanction.

However, this finding does not end the Court's inquiry, because it possesses the inherent power to imposed lesser sanctions including, but not limited to, precluding the introduction of

---

[19]     The Court notes that Defendant has submitted only the Affidavit of Kenneth Neal, Tiffin's Customer Relations Manager, who states that, in April 2005, while in the presence of Mr. Neal and Defendant's experts, Plaintiff Motorists' experts "attempted to reconstruct the placement of the propane gas supply lines . . . ."  (Dkt. No. 20, Part 3, at ¶¶ 1, 10, 11.)  "However, our ability to get a precise picture of where the lines were running in the vehicle at the time of the fire was impossible."  (*Id*.)

evidence.  *See Sterbenz v. Attina*, 205 F. Supp.2d 65, 74 (E.D.N.Y. 2002) ("[O]rdinarily, the

sanctions for spoliation involve preclusion of evidence, the drawing of an adverse inference,

dismissal or default.").

Here, after carefully considering the matter, the Court finds that the appropriate sanction

to be imposed on Plaintiffs, at least for purposes of Defendant's motion for summary judgment,

is the exclusion of all testimony of Daniel J. Stauffer that is in any way based on his personal

observation of the gas lines before their removal (rather than being based exclusively on the

photographs taken of the gas lines before their removal).  For example, the following testimony

should be, and is, excluded, for purposes of Defendant's motion for summary judgment:

> Gas supply lines, fittings and a gas manifold were located in the rear
> wheel well compartment and storage compartment.  I observed
> chaffing on one of the gas supply lines [prior to removal of the gas
> lines] . . . .  After having observed the damage to the RV and gas line,
> I believed that the ignition source for the fire may have come from . . .
> the gas supply line . . . .  The piping that was removed and secured as
> evidence was made of copper and attached to a fitting located in the
> rear wheel well.  The section of piping that I removed curved upward
> in the back of the wheel well and extended into the storage
> compartment.  It was not fastened or rigidly secured to the RV in any
> way. . . .  In order to remove the piping, I had only to loosen one
> fitting in the wheel well.  Other than unscrewing that one fitting,
> which was already loose, I made no other changes to the piping.

(Dkt. No. 24, Part 2, at ¶¶ 6, 8, 9 [Stauffer Affid.].)

However, as discussed earlier, numerous photographs were taken of the gas lines before

they were removed.  Moreover, Plaintiffs have adduced expert testimony based, in part, on these

photographs and a post-removal inspection of the RV and its gas lines.[20]  Together, this evidence

---

[20]      Furthermore, according to Plaintiffs' forensic mechanic expert Mark Sargent, Bob
Tiffin, owner of Tiffin Motorhomes Inc., testified in his deposition that the only area that the
propane line was protected with convoluted tubing was at and around the wheel well assembly
through which the propane line was routed.  (Dkt. No. 23, Part 7, at 12.)

is sufficient to create a genuine issue of material fact as to liability on the claims remaining in this action.

For all of these reasons, the Court imposes on Plaintiffs an appropriate sanction for spoliation of the evidence in question, but denies Defendant's request to dismiss Plaintiffs' remaining claims after imposing that sanction. The Court notes that, although it denies Defendants' alternative request for the exclusion of expert testimony on Plaintiff's behalf at any trial of this action, the Court does so *without prejudice*: the Court will revisit that issue (as well as the issue of whether to impose other spoliation sanctions) before trial, upon further briefing and/or oral argument by counsel.

## V.    CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is granted with regard to Plaintiffs' claim for recovery of the $81,777.32 for the loss of the RV itself under (1) a strict liability theory of liability and/or negligence theory of liability, because of the economic loss doctrine, and (2) a breach of express warranty theory. However, Defendant's motion for summary judgment is denied with regard to (1) Plaintiffs' claim for recovery of the $81,777.32 for the loss of the RV itself under a breach of express warranty theory, and (2) Plaintiffs' claim for recovery of the $23,436.69 for the loss of the RV's contents under a strict liability theory of liability and/or negligence theory of liability.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 20) is **GRANTED** in part and **DENIED** in part as set forth in Part V of this Decision and Order; specifically, surviving Defendant's motion are the following two claims of Plaintiffs: (1) Plaintiffs' claim for recovery of $23,436.69 for the loss of the RV's contents under a strict

liability theory of liability and/or negligence theory of liability; and (2) Plaintiffs' claim for

recovery of $81,777.32 for the loss of the RV itself under an implied warranty theory of liability;

and it is further

ORDERED that a telephone conference with counsel for all parties is scheduled for

**NOVEMBER 13, 2009 at 2:30 p.m.** to schedule trial and set pretrial submission deadlines.

Chambers will initiate the call.

Dated: October 27, 2009
Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge